IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LORI CROSS,                         )
                                    )
          Plaintiff,                )
                                    )
     vs.                            ) Civil Action No. 07-950
                                    )
COMMISSIONER OF SOCIAL              )
SECURITY,                           )
                                    )
          Defendant.                )

## MEMORANDUM OPINION

### I. Introduction

Plaintiff, Lori Cross, seeks judicial review of a decision
of Defendant, Commissioner of Social Security ("Commissioner"),
denying her applications for disability insurance benefits
("DIB") and supplemental security income ("SSI") under Titles II
and XVI, respectively, of the Social Security Act, 42 U.S.C.
§§ 401-433 and §§ 1381-1383f.  Presently before the Court are the
parties' cross-motions for summary judgment pursuant to
Fed.R.Civ.P. 56.  For the reasons set forth below, Plaintiff's
motion for summary judgment will be granted with respect to her
request for a remand of this case for further administrative
proceedings, and the Commissioner's cross-motion for summary
judgment will be denied.

1

## II. Background

### A. Procedural History

Plaintiff filed applications for DIB and SSI on July 9, 2004. She alleged disability since October 1, 2000 due to a "[p]inched nerve and bulging/herniated discs in neck and back."[1] (R. 54-57, 62-63). Plaintiff's applications were denied, and, on October 21, 2004, she requested a hearing before an Administrative Law Judge ("ALJ"). (R. 43). At the hearing, which was held on March 21, 2006, Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified. (R. 303-24).

On April 19, 2006, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI, concluding that Plaintiff retained the residual functional capacity ("RFC") to perform a range of sedentary work existing in significant numbers in the national economy. (R. 13-19). Plaintiff requested review of the ALJ's decision; however, the Appeals Council denied the request on May 11, 2007. (R. 5-9). This appeal followed.

### B. Plaintiff's Personal History

Plaintiff's date of birth is April 15, 1957, and she is a high school graduate. In addition, Plaintiff studied nursing at

---

[1]Due to the denial of prior applications for DIB and SSI on March 25, 2004, Plaintiff, through counsel, has amended her alleged onset date of disability to March 26, 2004. (R. 305-06).

Penn State University for six months,[2] and she attended modeling school. (R. 308). In October 1980, Plaintiff sustained injuries when she fell down steps. Although Plaintiff continued to experience pain from the injuries sustained in the 1980 fall, she worked as a waitress in a restaurant from 1995 to 1996, and she worked as stocker for Walmart from 1996 until October 1, 2000 when she claims she could no longer work due to "[c]onstant pain and discomfort." (R. 63, 309, 313).

## C. Vocational Expert Testimony

At the administrative hearing, the ALJ initially asked the VE to classify Plaintiff's past work. In response, the VE testified that Plaintiff's jobs as a stocker and a waitress were medium in exertion level and unskilled as performed. (R. 322).

The ALJ then asked the VE to assume a hypothetical individual of Plaintiff's age, education and work experience who is capable of performing sedentary work that does not involve lifting more than 10 pounds occasionally and allows the individual to sit most of the work day with a sit/stand option at 30-minute intervals. When asked whether there were any jobs that the hypothetical individual could perform, the VE responded affirmatively, identifying the jobs of a telephone solicitor, an

---

[2]Plaintiff's first language is Korean. Plaintiff testified during the hearing before the ALJ that she did not complete the nursing program at Penn State University because she had difficulty with the English language at that time. (R. 308).

3

assembler and a cashier. (R. 322).

Plaintiff's counsel then asked the VE whether his response
to the ALJ's hypothetical question would change if the individual
required one to two hours of rest throughout the workday, and the
VE testified that such a requirement would preclude gainful
employment. In response to a further question by counsel
concerning an employer's tolerance of employee absenteeism, the
VE testified that generally "one absence per month in unskilled
work is tolerated, two on occasion." (R. 323).

## D. Medical Evidence

The medical evidence in the administrative record in this
case may be summarized chronologically as follows:[3]

With respect to Plaintiff's primary medical care, she is
treated by the physicians at Lawrence County Family Medicine,
P.C. ("LCFM"). In late 2001, David R. Shober, M.D. of LCFM
referred Plaintiff to J.H. Kim, M.D. for a nerve conduction study
("NCS") and electromyography ("EMG") of her left upper extremity
following an automobile accident on October 16, 2001.[4] In his

---

[3]The Court has included in its summary the medical evidence
in the administrative record that pre-dates Plaintiff's amended
onset date of disability of March 26, 2004 for background
purposes. With respect to the lack of evidence of medical
treatment after August 11, 2005, at the hearing before the ALJ,
counsel reported that Plaintiff no longer had medical insurance
which precluded her from obtaining any further medical treatment.
(R. 306).

[4]Nerve conduction studies are used mainly for evaluation of
parasthesias (numbness, tingling, burning) and/or weakness of the

4

report of the NCS/EMG conducted on January 14, 2002, Dr. Kim noted that Plaintiff's physical examination revealed mild limitations in her cervical range of motion in all directions with pain, trigger points in her left scapular, sporadic pinprick deficits in her left wrist, thumb and index finger, intact reflexes, 5/5 motor strength proximally and 5/5 hand grip strength. Dr. Kim also noted in the report that previous magnetic resonance imaging ("MRI") revealed bulging disks in Plaintiff's cervical spine at C4-5, C5-6 and C6-7.[5] Dr. Kim described his impression of Plaintiff's electrodiagnostic studies as "Mild left C6 nerve root irritation/Radiculopathy on the left side,"[6] and he suggested epidural blocks of Plaintiff's cervical

arms and legs. Electromyography is a technique for evaluating physiologic properties of muscles. www.wikipedia.org (last visited 9/22/2008).

[5]Magnetic resonance imaging is primarily a medical imaging technique most commonly used in Radiology to visualize the structure and function of the body. It provides detailed images of the body in any plane. MRI provides much greater contrast between the different soft tissues of the body than does computed tomography, making it especially useful in neurological (brain), musculoskeletal, cardiovascular and oncological (cancer) imaging. www.wikipedia.org (last visited 9/22/2008).

[6]Individuals suffering from radiculitis report pain that radiates along a nerve path because of pressure on the nerve root where it connects to the spine. The location and type of pain depends on the area of the spine where the compression occurs. For instance, radiculitis in the cervical spine may cause pain in the neck or radiate down the arm. If located in the thoracic spine, radiculitis may cause pain in the chest area. The most common complaint, however, is in the lower or lumbar spine area, with pain in the hips, legs and feet. This pain is often called sciatica, since it most usually originates from the lumbar

spine.   (R. 99-100, 196-97).

On October 6, 2003, Plaintiff presented to the Emergency
Room ("ER") of Jameson Memorial Hospital complaining of low back
pain after a fall.[7]  A CT scan of Plaintiff's head and x-rays of
her lumbar spine and left ribs were performed.   The CT scan
showed no evidence of intracranial hematoma or hemorrhage and no
fracture;[8] the x-ray of Plaintiff's lumbar spine showed no
evidence of fracture or dislocation; and the x-ray of Plaintiff's
left ribs showed no fracture or pneumothorax.[9]  (R. 177, 198-205).

During a follow-up visit at LCFM on October 8, 2003,
Lawrence A. Fazioli, M.D. noted that Plaintiff had "chronic

region, where the sciatic nerves enter the spinal canal. Sciatica
is a common problem for those suffering from disc deterioration
or injury involving the lower back.  www.spinaldisorders.com
(last visited 9/22/2008).

[7]Prior to going to the ER on October 6, 2003, Plaintiff
spoke with Dr. Shober of LCFM.  Plaintiff reported that she felt
ill and had fallen down 12 steps, and she requested a note from
Dr. Shober excusing her from attending an appointment with her
probation officer the next day.  Noting that Plaintiff sounded
intoxicated, but that this observation may be attributable to
mental status changes as a result of the fall, Dr. Shober
instructed Plaintiff to go to the ER.   (R. 262).

[8]A CT scan, or computed tomography, is a diagnostic
procedure that uses special x-ray equipment to create cross-
sectional pictures of your body. CT images are produced by using
x-ray technology and powerful computers.  www.nlm.nih.gov/
medlineplus/encyc (last visited 9/22/2008).

[9]Pneumothorax is the collection of air or gas in the space
around the lungs.  www.nlm.nih.gov/medlineplus/encyc (last
visited 9/22/2008).

6

paralumbar tenderness and dorsal spine kyphosis,"[10] and that
Plaintiff was told he could not prescribe any more pain
medication for her. Plaintiff was given Vioxx and Skelaxin,[11]
referred to a pain clinic and instructed to avoid all narcotics.
(R. 261).

On October 30, 2003, Plaintiff called LCFM complaining of
chest pain and difficulty breathing. Plaintiff reported that she
was a "nervous wreck," and she was described as "tearful" and
"anxious." Plaintiff was advised to go to the ER by ambulance.
(R. 264). Plaintiff followed the advise and went to the ER of
Jameson Memorial Hospital.[12] A CT scan of Plaintiff's chest was
described as "unremarkable;" a CT scan of Plaintiff's head showed
"no significant abnormality;" and an x-ray of Plaintiff's chest

---

[10]Kyphosis is a curving of the spine that causes a bowing of
the back, which leads to a hunchback or slouching posture.
www.nlm.nih.gov/medlineplus/encyc (last visited 9/22/2008).

[11]Vioxx was a COX-2 selective non-steroidal anti-inflammatory
drug which was voluntarily removed from the market by its
manufacturer in September 2004 after studies showed that it
raised the risk of heart attack and stroke. www.fda.gov (last
visited 9/22/2008). Skelaxin is a muscle relaxant that is used
with rest, physical therapy and other measures to relax muscles
and relieve pain and discomfort caused by strains, sprains and
other muscle injuries. www.nlm.nih.gov/medlineplus/druginfo
(last visited 9/22/2008).

[12]The ER records indicate that Plaintiff was taking Percocet
and Paxil at that time. Percocet, a brand name for Oxycodone, is
used to relieve moderate to moderate-to-severe pain. Oxycodone
may be habit-forming. Paxil is used to treat depression, panic
disorder and social anxiety disorder. www.nlm.nih.gov/
medlineplus/druginfo (last visited 9/22/2008).

7

showed no active lung disease. Plaintiff's diagnosis was chest pain due to anxiety. (R. 169-71, 206-16).

On November 2, 2003, Plaintiff presented to the ER of Jameson Memorial Hospital after falling down 13 steps. An x-ray of Plaintiff's lumbar spine showed no evidence of fracture and mild narrowing of the lumbosacral disc space. Plaintiff was given Percocet and Flexeril and discharged with the diagnoses of contusion and disc syndrome.[13] (R. 168, 217-20).

On November 7, 2003, Plaintiff was seen at LCFM by Dr. Porter for complaints of increased back pain as a result of the fall several days earlier. Dr. Porter noted that an x-ray of Plaintiff's lumbar spine after the fall showed no acute disease. Dr. Porter's treatment plan for Plaintiff included an MRI, Flexeril and Percocet, physical therapy and moist heat. (R. 104).

On February 6, 2004, Dr. Porter referred Plaintiff to Frank Kunkel, M.D., a pain specialist, for management of her chronic low back pain. In his referral letter, Dr. Porter noted, among other things, that an MRI of Plaintiff's lumbar spine had been ordered, but was not performed because it was not covered by insurance. Dr. Porter also noted that Plaintiff had called in

---

[13]Flexeril, a muscle relaxant, is used with rest, physical therapy and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains and other muscle injuries. www.nlm.nih.gov/medlineplus/druginfo (last visited 9/22/2008).

8

recently for a refill of pain medication; however, due to her
recent release from jail, "chronic narcotics" had to be
prescribed by a pain management specialist. Thus, Plaintiff was
being referred to Dr. Kunkel for all further pain management.
(R. 103).

On February 11, 2004, Plaintiff was seen at LCFM by Dr.
Fazioli for complaints of persistent cervical pain. Dr. Fazioli
noted that Plaintiff was instructed to avoid narcotic pain
medication unless prescribed by Dr. Kunkel, and that an MRI would
be ordered for Plaintiff again. (R. 102).

An MRI of Plaintiff's lumbar spine was performed on February
18, 2004 and showed a mild bulge at L4-5, but no fracture or disc
herniation.[14] (R. 161, 223).

Based on the referral by Dr. Porter, Plaintiff was evaluated
by Dr. Kunkel for pain management on February 20, 2004. With
respect to her pain history, Plaintiff reported that she had been
suffering from lumbar pain for 23 years as a result of falling
down steps and that she had been suffering from cervical pain
since a motor vehicle accident in 2001. Plaintiff rated her pain
level a 9 on a scale of 1 to 10, indicating that she also
suffered from numbness in her left leg and both hands. Plaintiff

[14]A herniated disk is a slipped disk along the spinal cord.
The condition occurs when all or part of the soft center of a
spinal disk is forced through a weakened part of the disk.
www.nlm.nih.gov/medlineplus/encyc (last visited 9/22/2008).

9

also reported that her pain increased with lifting, bending, prolonged sitting and stress, and that the pain interfered with her ability to sleep through the night, *i.e.*, she awakened every hour due to the pain. Plaintiff's physical examination by Dr. Kunkel revealed pain on palpation in her cervical and lumbar spines; painful range of motion in her cervical and lumbar spines; a grinding noise in her neck area; decreased strength and a positive Tinel's sign in her left upper extremity;[15] a positive bilateral straight leg raise test; and pain on heel/toe walking. Dr. Kunkel's assessment was cervical and lumbar radiculopathy. Plaintiff was given a prescription for Duragesic patches[16] and steroid injections were discussed.[17]  (R. 109-15).  On March 5,

---

[15]Tinel's sign is a way to detect irritated nerves.  It is performed by lightly tapping over the nerve to elicit a sensation of tingling or "pins and needles" in the distribution of the nerve.  www.wikipedia.org (last visited 9/22/2008).

[16]Duragesic is the brand name for Fentanyl.  Fentanyl skin patches are used to relieve moderate to severe pain that is expected to last for some time, that does not go away, and that cannot be treated with other pain medications.  Fentanyl skin patches are only used to treat people who are tolerant to narcotic pain medications because they have taken this type of medication for at least 1 week.  Fentanyl is in a class of medications called opiate (narcotic) analgesics.  www.nlm.nih.gov/medlineplus/druginfo (last visited 9/22/2008).

[17]Following Plaintiff's initial pain management evaluation, Dr. Kunkel sent a letter to Dr. Porter, noting that Plaintiff's MRI showed a mild bulge at the L4-5 level which was consistent with her diffuse complaints of low back pain.  Dr. Kunkel also noted that Plaintiff admitted to a history of cocaine abuse; that she had recently been incarcerated for 68 days for a cocaine-related offense; that she was undergoing aggressive counseling for her addiction; and that Plaintiff denied using cocaine since

10

2004, Dr. Kunkel administered an epidural steroid injection to Plaintiff's lumbar spine. (R. 108).

On April 5, 2004, Plaintiff presented to the Pain Clinic of Jameson Memorial Hospital complaining of low back pain radiating into her hip. She was evaluated by A. Razzak, M.D. In addition to constant "dull, deep, crampy and bothersome" pain which awakened her during the night, Plaintiff reported cervical pain which radiated to her upper extremities and caused numbness and tingling. With respect to past medical history, Dr. Razzak noted that Plaintiff had a history of generalized anxiety disorder and depression for which she had taken Paxil in the past. Dr. Razzak's diagnoses included: 1. HERNIATED NUCLEUS PULPOSUS AT LEVEL L4-L5 BY MRI; 2. GENERALIZED ANXIETY DISORDER; 3. MYOFASCIAL PAIN SYNDROME;[18] and 4. CHRONIC FATIGUE SYNDROME.[19]

---

the beginning of her incarceration. Due to Plaintiff's history of substance abuse, Dr. Kunkel noted that he had consulted a psychologist who was an addiction specialist for her input on Plaintiff's case. (R. 112).

[18]Myofascial pain syndrome is a chronic local or regional musculoskeletal pain disorder that may involve either a single muscle or a muscle group. The pain may be of a burning, stabbing, aching or nagging quality. In addition to the local or regional pain, people with myofascial pain syndrome also can suffer from depression, fatigue and behavioral disturbances, as with all chronic pain conditions. www.stoppain.org (last visited 9/22/2008).

[19]Chronic fatigue syndrome ("CFS") is a disorder that causes extreme fatigue. The fatigue is not the kind of tired feeling that goes away after you rest. Instead, it lasts a long time and limits your ability to do ordinary daily activities. Symptoms of CFS include fatigue for 6 months or more and other problems such

11

Plaintiff was scheduled for a lumbar epidural steroid injection the next day. (R. 149-50).

Between April 6, 2004 and May 18, 2004, Plaintiff underwent a series of four lumbar epidural steroid injections by Dr. Razzak. The procedure note for the fourth injection indicates that Plaintiff had done "extremely well" after the first three injections. Specifically, Plaintiff reported that the level of her pain had decreased to a 2 out of 10 levels.[20] After the fourth injection, Dr. Razzak gave Plaintiff a prescription for Percocet for 30 days, recommended a cervical MRI, and instructed her to return to Dr. Fazioli for further pain management. (R. 142-143, 145-46).

On June 14, 2004, an MRI of Plaintiff's cervical spine was performed. The MRI revealed (1) a posterior cervical herniation of the disc at the T3-4 level, (2) a bulging disc with posterior osteophyte at the C5-6, C6-7 and C7-T1 levels, (3) minimal

---

as muscle pain, memory problems, headaches, pain in multiple joints, sleep problems, sore throat and tender lymph nodes. Since other illnesses can cause similar symptoms, CFS is hard to diagnose. www.nlm.nih.gov/medlineplus/encyc (last visited 9/22/2008).

[20]The procedure note for Plaintiff's third lumbar epidural steroid injection on May 4, 2004 indicates that Plaintiff had received two injections with "very good results." However, due to her husband's surgery for a cervical fusion, Plaintiff's pain had returned "somewhat" as a result of caring for her husband and engaging in more driving and lifting activities. (R. 143).

bulging discs, and (4) cervical spondylosis.[21]  (R. 158).

Due to the results of Plaintiff's cervical spine MRI, she was referred to the Jameson Memorial Hospital Pain Clinic for cervical epidural steroid injections. Between June 21, 2004 and July 28, 2004, Plaintiff underwent a series of four cervical epidural steroid injections by Dr. Razzak. During a follow-up visit on July 21, 2004, Plaintiff reported that her pain symptomatology was "much reduced," and her overall health was "much better." (R. 131, 133-34, 136, 138, 141).

During a follow-up visit at LCFM with Dr. Fazioli on July 27, 2004, Plaintiff denied the use of illicit drugs, and she reported that she was no longer taking pain medication. Plaintiff also reported that she had been unable to work due to chronic back pain. Plaintiff's physical examination revealed restriction in flexion and extension of her cervical and lumbar spines. No other neurological deficits were noted. Dr. Fazioli's assessment was (1) C6 radiculopathy, (2) chronic lumbar pain, (3) degenerative joint disease, (4) bulging disc syndrome, (5) cigarette abuse, and (6) prior history of drug abuse. Plaintiff was instructed to return in 4 months. (R. 259).

_____

[21]Cervical spondylosis is a disorder caused by abnormal wear on the cartilage and bones of the neck (cervical vertebrae) with degeneration and mineral deposits in the cushions between the vertebrae (cervical disks). www.nlm.nih.gov/medlineplus/encyc (last visited 9/22/2008).

13

On August 11, 2004, Dr. Razzak wrote a letter to Dr. Fazioli to inform him that Plaintiff was being discharged from the Pain Clinic because her treatment course had been completed.[22] Noting that Plaintiff had received 4 lumbar epidural steroid injections and 4 cervical epidural steroid injections over the course of several months, Dr. Razzak indicated that Plaintiff had achieved "significant relief in [her] symptoms." Dr. Razzak also noted that Plaintiff had taken Percocet over the previous few months and indicated that Plaintiff would follow-up with Dr. Fazioli for her medications and other health issues. (R. 283).

On August 31, 2004, a non-examining State agency medical consultant performed a Physical RFC Assessment for Plaintiff based on a review of her medical records. The physician opined that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds; that Plaintiff could stand and/or walk about 6 hours in an 8-hour work day; that Plaintiff could sit about 6 hours in an 8-hour work day; that Plaintiff's ability to push and pull with her upper and lower extremities was unlimited; that Plaintiff could occasionally engage in all postural activities, i.e., climbing, balancing, stooping, kneeling, crouching and

_____

[22]The note for Plaintiff's final follow-up visit with Dr. Razzak on August 11, 2004 indicates that Plaintiff reported an 80% decrease in her symptoms; that Plaintiff was "doing consistently well an (sic) the symptoms have not recurred"; that Plaintiff would follow-up with Dr. Razzak in one month and in three months; and that Plaintiff would receive repeat injections if needed. (R. 284).

14

crawling; and that Plaintiff had no manipulative, visual, communicative or environmental limitations.[23] (R. 184-91).

On September 22, 2004, Plaintiff returned to Dr. Kunkel, the pain management specialist, with continued complaints of low back and neck pain. In his report of Plaintiff's examination, Dr. Kunkel noted that she was in no apparent distress, and that she did not show any signs of addiction or diversion behavior or medication excess. Plaintiff's pain was exacerbated by turning her head to the extreme left and right and her straight leg raise test was positive bilaterally. However, Plaintiff's upper and lower extremities were grossly intact with respect to motor strength and sensation. Dr. Kunkel's assessment was cervical and lumbar radiculopathy, and he agreed to take over writing her prescriptions for medication. (R. 240-41). During a follow-up visit with Dr. Kunkel on October 20, 2004, Plaintiff reported ongoing low back and neck pain. She also reported that her pain medication was "inadequate," and that "Percocet 10s would be better." Dr. Kunkel declined, however, to change her medication. (R. 254).

Plaintiff returned to the Jameson Memorial Hospital Pain

---

[23]In assessing Plaintiff's physical RFC, the physician noted that although Plaintiff's allegations of some limitations in her ability to lift, carry, climb and bend were credible, her allegations of significant limitations in these functions were not credible. The physician further noted that Plaintiff's allegations of significant limitations in standing, walking and sitting were not credible. (R. 194).

15

Clinic on October 26, 2004 for her complaints of continued low back pain and lumbosacral radiculopathy. Dr. Razzak administered the first injection in a second series of lumbar epidural steroid injections, gave Plaintiff a prescription for Percocet for 15 days, and instructed Plaintiff to return in 2 weeks. (R. 285).

Plaintiff's second lumbar epidural steroid injection in the second series was administered by Dr. Razzak on November 9, 2004. Plaintiff was given a prescription for Percocet for 30 days and instructed to return in 2 weeks. (R. 267). On November 22, 2004, Plaintiff returned to Dr. Razzak for a third lumbar epidural steroid injection. Plaintiff's examination revealed a heart rate of 120 and blood pressure of 170/90 with "significant shake in her overall status." Plaintiff reported that she had not slept the previous 2 days "because she has been trying to move her stuff into her new house." Dr. Razzak did not administer a lumbar epidural steroid injection to Plaintiff due to her elevated heart rate and blood pressure and recommended that she go to the ER. (R. 266). Plaintiff's third lumbar epidural steroid injection in the second series was administered by Dr. Razzak on December 2, 2004, and Plaintiff was instructed to return in 2 weeks. (R. 286).

Plaintiff saw Dr. Fazioli at LCFM for a follow-up visit on December 9, 2004. In the notes of this visit, Dr. Fazioli indicated that he had reviewed Dr. Razzak's notes relating to

16

Plaintiff's recent elevated heart rate and blood pressure.
During this office visit, Plaintiff denied chest pain or
shortness of breath, although she reported continued chronic back
pain. Dr. Fazioli's assessment included: 1. Atypical chest pain,
2. Strong family [history] of heart disease, 3. Chronic cervical
and lumbar back problems, and 4. Prior [history] of pain
medication abuse but currently being controlled by pain
management. Dr. Fazioli indicated that he would check
Plaintiff's recent echocardiogram and thallium stress test,[24] and
that he would order a chest x-ray for Plaintiff before her next
follow-up visit. (R. 258).

On December 15, 2004, Dr. Razzak administered the fourth and
final lumbar epidural steroid injection in the second series.
Plaintiff was discharged from the Pain Clinic, and instructed to
return as needed. (R. 287). A week later, Plaintiff was seen by
Dr. Razzak complaining of a headache since the day after the last
injection. Dr. Razzak noted that Plaintiff's signs and symptoms
were consistent with a posterior puncture headache, and he

_____

[24]An echocardiogram is a test that uses sound waves to create
a moving picture of the heart. The picture is much more detailed
than x-ray image and involves no radiation exposure. A thallium
stress test is a nuclear imaging method that provides a view of
the blood flow into the heart muscle, both at rest and during
activity. www.nlm.nih.gov/medlineplus/encyc (last visited
9/22/2008).

17

administered an epidural blood patch to Plaintiff.[25] Plaintiff
was observed in the Pain Clinic for 90 minutes. Her headache
subsided before she left the Pain Clinic. Plaintiff was
instructed not to do any heavy lifting or bending for 36 hours
and to return in 2 weeks. (R. 288).

Plaintiff's follow-up visit with Dr. Razzak took place on
January 10, 2005. Plaintiff reported that her headache was
resolving and that she was doing better. Noting that Plaintiff
had been taking Percocet for over 9 months, Dr. Razzak
recommended that she stop taking Percocet. To wean her off the
Percocet, Plaintiff's daily dosage was decreased, and she was
instructed to return in 2 weeks for a further reduction in her
daily dosage. (R. 289).

Dr. Razzak saw Plaintiff for a follow-up visit on January
24, 2005. At that time, Plaintiff was taking a Percocet every 12
hours. Plaintiff was instructed to take this dosage for two more
weeks and then reduce the dosage to one Percocet per day. Dr.

[25]An epidural blood patch ("EBP") is done when a person has a
spinal headache, usually from a myelogram or lumbar puncture.
This type of headache can occur when there is a hole or tear of
the covering of the spinal fluid/spinal cord, which causes spinal
fluid to leak through. A severe headache results. This headache
is usually different from a typical headache. It usually is not
present when you lie down and painful when you stand up. Nausea
and vomiting commonly occur when the pain is severe. The blood
patch is the injection of your own blood, which is taken from
your arm, into the epidural space in your spine. The blood
remains in your epidural space where it will clot or "patch" the
hole/tear. www.painfoundation.org (last visited 9/22/2008).

18

Razzak indicated that Plaintiff would return in 2 weeks. (R. 290).

In the notes of Plaintiff's follow-up visit on February 7, 2005, Dr. Razzak indicated that Plaintiff has generalized osteoarthritis of the cervical and lumbosacral spines; that he would commence a second series of cervical epidural steroid injections; and that, in the meantime, Plaintiff would be maintained on one Percocet every 12 hours. (R. 272).

On March 7, 2005, Dr. Razzak administered the first cervical epidural steroid injection in the second series of such injections. Plaintiff was given a prescription for Percocet for 30 days and "strongly advised" to stop taking Percocet. Dr. Razzak indicated that they would "try to reduce the dose the next time she comes back." (R. 291). Plaintiff's second and third cervical epidural steroid injections in the second series were administered by Dr. Razzak on April 4, 2005 and April 28, 2005. After the third injection, Plaintiff was instructed to return within 3 months, and she was given a prescription for Percocet for 30 days with no refills. (R. 265, 292).

The last note of the Pain Clinic in the administrative file is dated August 11, 2005, and was written by William McClain, M.D. Dr. McClain indicated that Plaintiff was referred to him for a sacroiliac joint injection, and he noted that Plaintiff was "exquisitely tender over her left sacroiliac joint." The

19

injection was administered and Plaintiff reported that her pain was "much improved." Dr. McClain noted that Plaintiff would undergo thermo-radio frequency ablation of the sacroiliac joint if the injection did not provide "prolonged relief beyond the effect of the local anesthetic." (R. 293).

## IV. Legal Analysis

### A. Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under 42 U.S.C. § 405(g) and § 1383(c)(3) (incorporating § 405(g)), which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence. Monsour Medical Center v. Heckler, 806

20

F.2d 1185, 1190-91 (3d Cir.1986).

## B. The ALJ's Decision

In order to establish a disability under the Social Security
Act, a claimant must demonstrate an inability to engage in any
substantial gainful activity due to a medically determinable
physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a
continuous period of not less than 12 months. 42 U.S.C.
§ 423(d)(1). A Social Security claimant is considered unable to
engage in any substantial gainful activity only if his physical
or mental impairment or impairments are of such severity that he
is not only unable to do his previous work but cannot,
considering his age, education, and work experience, engage in
any other kind of substantial gainful work which exists in the
national economy. 42 U.S.C. § 423(d)(2)(A).

In Burnett v. Commissioner of Social Security Admin., 220
F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure
an ALJ must follow in evaluating a claim for Social Security
disability benefits, stating in relevant part:

\* \* \*

In Plummer, we recounted the five step sequential
evaluation for determining whether a claimant is under a
disability, as set forth in 20 C.F.R. § 404.1520:

In step one, the Commissioner must determine
whether the claimant is currently engaging in
substantial gainful activity. 20 C.F.R. § 404.1520(a).
If a claimant is found to be engaged in substantial

21

gainful activity, the disability claim will be denied. Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287, 2290-91, 96 L.Ed.2d 119 (1987). In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir.1994).

If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. The ALJ must analyze the cumulative effects of all the claimant's impairments in determining whether she is capable of performing work and is not disabled.

Plummer, 186 F.3d at 428.

\*    \*    \*

220 F.3d at 118-19.

With respect to the ALJ's sequential evaluation in the present case, steps one and two were resolved in Plaintiff's

22

favor: that is, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of disability and that Plaintiff suffers from a severe impairment, *i.e.*, degenerative disc disease of the cervical and lumbar spines. (R. 15). Regarding step three, the ALJ found that Plaintiff's impairment did not meet or equal the requirements of any listed impairment in 20 C.F.R., Pt. 404, Subpt. P, App. 1. (R. 16). Turning to step four, the ALJ found that Plaintiff is unable to perform any past relevant work. (R. 18). Finally, with respect to step five, the ALJ concluded that Plaintiff retained the RFC to perform a range of sedentary work existing in significant numbers in the national economy. (R. 17-18). Thus, the ALJ denied her applications for DIB and SSI.

## C. Discussion

Plaintiff initially asserts that the ALJ erred by failing to consider all of her physical and mental impairments. Specifically, Plaintiff claims that the ALJ ignored her diagnoses of (a) myofascial pain syndrome, (b) carpal tunnel syndrome, (c) CFS and (d) depression, anxiety and panic disorder. After consideration, the Court finds this argument lacking in merit.

With respect to myofascial pain syndrome, as noted by the Commissioner, this diagnosis is, in essence, a diagnosis of muscle pain (Df's Brief in Support, p. 8), and the focus of the ALJ's entire decision was Plaintiff's complaints of cervical and

23

lumbar pain. Accordingly, the ALJ's failure to address

Plaintiff's diagnosis of myofascial pain syndrome as a separate

physical impairment was not erroneous.

Turning to carpal tunnel syndrome, Plaintiff's alleged

"diagnosis" of this condition is contained in the notes of the

non-examining State agency medical consultant that are attached

to his Physical RFC Assessment dated August 31, 2004. A review

of those notes, however, reveals the State agency medical

consultant did not state that Plaintiff had been diagnosed with

carpal tunnel syndrome. Rather, he merely noted that NCS/EMG

studies of Plaintiff's upper extremities on November 28, 2003,

which are not in the administrative file, revealed mild

neuropathy "suggesting borderline carpal tunnel syndrome on the

left." (R. 192). Thus, Plaintiff's claim that she has been

diagnosed with carpal tunnel syndrome is misleading. In any

event, as noted by the Commissioner, a disability claimant must

show more than a mere diagnosis. A disability claimant must show

specific functional limitations from the condition that interfere

with the ability to perform substantial gainful activity, and

there is no evidence in the administrative file on which to base

a finding that carpal tunnel syndrome interferes with Plaintiff's

ability to perform such activity. Petition of Sullivan, 904 F.2d

826, 845 (3d Cir.1990). (Df's Brief in Support, p. 8). Based on

the foregoing, the ALJ did not err by failing to consider carpal

24

tunnel syndrome as a separate physical impairment.[26]

As to CFS, the Court's review of the administrative file reveals a diagnosis of CFS on one occasion. Specifically, in the report of Plaintiff's initial evaluation at the Jameson Memorial Hospital Pain Clinic, Dr. Razzak listed CFS among Plaintiff's diagnoses. (R. 150). As noted by the Commissioner, however, the only basis for this "diagnosis" appears to be Plaintiff's subjective complaint of difficulty sleeping through the night due to pain during the initial evaluation. (Df's Brief in Support, p. 9). There is no evidence that Plaintiff has ever sought treatment for CFS or that she has been tested for CFS. Thus, the ALJ did not err by failing to consider CFS as a separate physical impairment.[27]

Finally, regarding the ALJ's alleged error in failing to consider the mental impairments of depression, anxiety and panic attacks, the Court notes as an initial matter that there is no evidence in the administrative file indicating that Plaintiff has been diagnosed with panic attacks. The only reference to panic attacks is contained in the report of Plaintiff's initial evaluation by Dr. Kunkel for pain management on February 2, 2004.

---

[26]The Court also notes that carpal tunnel syndrome was not included as a disabling condition in Plaintiff's applications for DIB and SSI.

[27]As with carpal tunnel syndrome, the Court also notes that Plaintiff did not include CFS as a disabling condition in her applications for DIB and SSI.

25

Specifically, the top portion of page 2 of the report includes

"Panic attacks" following the heading "PSYCHIATRIC." (R. 115).

It is clear, however, that the inclusion of panic attacks

following this heading is not a diagnosis. In its entirety, the

top portion of page 2 of Dr. Kunkel's report provides:

\*   \*   \*

CARDIOVASCULAR: Palpitations, rapid heartbeat, chest pain,
shortness of breath, valvular heart disease, previous heart
attacks.
RESPIRATORY: Coughing, wheezing, pleurisy, asthma/
bronchitis.
GASTROINTESTINAL: Loss of appetite, difficult or painful
swallowing, nausea, belching, excess gas, abdominal pain,
vomiting, bloody stools, jaundice, change in bowel habits,
previous transfusions, history of polyps.
GENITOURINARY: Difficulty urinating, urinating at night,
incontinence, kidney stones.
MUSCULOSKELETAL: Arthritis.
INTEGUMENTARY: Itching, change in hair, new moles or other
growths.
NEUROLOGICAL: Weakness, seizures, difficulty walking.
PSYCHIATRIC: Panic attacks, difficulty sleeping, suicide
attacks.
ENDOCRINE: Thyroid problems, goiter, menstrual problems,
hair loss, excessive thirst or hunger.
HEMATOLOGIC/LYMPHATIC: Anemia, bleeding, enlarged lymph
nodes.
ALLERGIC/IMMUNOLOGIC: Eczema, allergies, hay fever, asthma,
immunizations.

\*   \*   \*

Any argument that this portion of Dr. Kunkel's report can be

construed as a diagnosis of "panic attacks" is tantamount to

arguing that Plaintiff has been diagnosed with all of the other

listed conditions, which clearly is not the case. Moreover, as

noted by the Commissioner, Dr. Kunkel's report was prepared in

conjunction with Plaintiff's initial evaluation for pain
management and was based solely on the medical history provided
by Plaintiff. (Df's Brief in Support, p. 9). Turning to
diagnoses of depression and anxiety, Plaintiff cites the report
of her initial evaluation by Dr. Razzak at the Jameson Memorial
Hospital Pain Clinic on April 5, 2004. (R. 149-50). It is
clear, however, that "GENERALIZED ANXIETY DISORDER" was included
among Plaintiff's diagnoses by Dr. Razzak based solely on the
medical history provided by Plaintiff during the initial
evaluation. The only evidence in the administrative file
pertaining to depression and anxiety is dated October 30, 2003,
prior to Plaintiff's amended onset date of disability.
Specifically, on that date, Plaintiff called LCFM complaining of
chest pain and difficulty breathing, and the person with whom
Plaintiff spoke described her as "anxious." (R. 264). When she
went to the ER later that day, Plaintiff was diagnosed as
suffering from chest pain due to anxiety, and the ER records
indicate that Plaintiff was taking Paxil, an anti-depressant, at
the time. (R. 207). There is no further medical evidence of
complaints of, or treatment for, depression or anxiety. Under
the circumstances, the ALJ did not err by failing to address
these mental impairments.[28]

_____

[28]As with carpal tunnel syndrome and CFS, the Court also
notes that Plaintiff did not allege a disabling mental impairment
in her applications for DIB and SSI. Moreover, during the

Plaintiff also asserts that the ALJ erred by relying on the VE's testimony to support the denial of her applications for DIB and SSI because the hypothetical question posed to the VE did not fully incorporate her complaints of pain,[29] implicating both the ALJ's RFC assessment and his credibility determination. After consideration, the Court agrees with Plaintiff that the case must be remanded for further proceedings with regard to these issues.

As noted previously, the ALJ concluded that Plaintiff retained the RFC to perform sedentary work which allowed her to remain seated "most of the workday with a sit/stand option at about 30 minute intervals" and which did not require lifting more than 10 pounds occasionally, and this RFC assessment was the basis for the ALJ's hypothetical question to the VE. (R. 17). In support of his assessment of Plaintiff's RFC, the ALJ gave "substantial weight" to the opinion of the non-examining State

---

hearing before the ALJ, Plaintiff's counsel stated on the record that "this is a pain case ... [Plaintiff] is disabled as the result of her pain." (R. 307).

[29]In Ferguson v. Schweiker, 765 F.2d 31 (3d Cir.1985), the Court of Appeals for the Third Circuit stated that the standard for considering subjective complaints of pain requires the following: (1) subjective complaints of pain must be seriously considered, even where not fully confirmed by objective medical evidence; (2) subjective pain may support a claim for disability benefits; (3) when subjective complaints of pain are supported by medical evidence, they should be given great weight; and (4) where a claimant's testimony as to pain is reasonably supported by medical evidence, the ALJ may not discount the claimant's pain without contrary medical evidence. Id. at 37.

28

agency medical consultant concerning Plaintiff's ability to
engage in physical work-related activities, i.e., the ability to
lift, carry, stand, walk, sit, push, pull, climb, balance, stoop,
kneel, crouch and crawl, despite her complaints of pain. (R.
17). In so doing, the Court concludes that the ALJ erred.

First, the opinion of the non-examining State agency medical
consultant was rendered on August 31, 2004. Thus, the opinion
was rendered without the benefit of the medical records relating
to Plaintiff's second series of both lumbar and cervical epidural
steroid injections, which were administered by Dr. Razzak between
October 26, 2004 and April 28, 2005, when Plaintiff's initial
series of lumbar and cervical epidural steroid injections failed
to provide more than temporary pain relief.

Second, in light of Plaintiff's long history of treatment
for neck and back pain by two pain specialists and the physicians
at LCFM, as well as abundant objective medical evidence of
conditions supporting Plaintiff's pain complaints, the ALJ should
have obtained one or more medical source statements concerning
Plaintiff's ability to perform work-related physical activities
before assessing Plaintiff's RFC. At the very least, the ALJ
should have arranged a consultative examination of Plaintiff by
an appropriate specialist to obtain an opinion regarding
Plaintiff's ability to perform work-related physical activities.
Under the circumstances, the case will be remanded for the

receipt of additional evidence regarding Plaintiff's RFC.

On remand, the ALJ also should re-consider the issue of Plaintiff's credibility. In his decision, the ALJ found that Plaintiff's complaints of disabling pain were not entirely credible for the following reasons: (1) despite testimony of a severely limited physical capacity, in November 2004, when Plaintiff presented to the Jameson Memorial Hospital Pain Clinic for a lumbar epidural steroid injection, she informed Dr. Razzak that she had worked "with little rest for about two days moving her stuff into a new house," and during a follow-up visit with Dr. Fazioli on December 9, 2004, Plaintiff reported that she was feeling better; (2) a letter by Dr. Razzak to Dr. Fazioli dated August 11, 2004, as well as the office notes of Dr. Razzak on this date, indicate that Plaintiff obtained "significant relief" from the lumbar and cervical epidural steroid injections, *i.e.*, an 80% decrease in her symptoms; and (3) Plaintiff's claim of severe migraine headaches is not supported by the medical records. (R. 17). A review of the record shows that the first two reasons justifying the ALJ's credibility determination are specious.[30]

Turning to the first reason for the ALJ's adverse

_____

[30]With respect to the ALJ's third reason for determining that Plaintiff's complaints of disabling pain were not entirely credible, the Court agrees with the ALJ that the medical evidence does not support Plaintiff's claim of regular, severe migraine headaches.

30

credibility determination, as noted by Plaintiff, it is well established that sporadic or transitory activity does not disprove disability. *See* Smith v. California, 637 F.2d 968, 971-72 (3d Cir.1981). Thus, the fact that Plaintiff participated in the move to a new house in November 2004 is insufficient to disprove her claim of disabling pain. As to the ALJ's statement that Plaintiff reported feeling better during the follow-up visit with Dr. Fazioli on December 9, 2004, a review of the doctor's office notes shows that the reference to "feeling better" related to Plaintiff's elevated heart rate and blood pressure on November 22, 2004 (which was the basis for Dr. Razzak's decision not to administer an injection to Plaintiff on that date). Plaintiff continued to report chronic back pain to Dr. Fazioli during the December 9th office visit, and the doctor specifically noted that Plaintiff would be following up at the pain clinic. (R. 258).

With regard to the second reason for the ALJ's adverse credibility determination, although Dr. Razzak's letter to Dr. Faziola on August 11, 2004, as well as his office notes for that date, indicate that Plaintiff had obtained significant pain relief from the first series of lumbar and cervical epidural steroid injections, the ALJ fails to acknowledge that the relief was temporary, resulting in the initiation of a second series of lumbar and cervical epidural steroid injections by Dr. Razzak approximately two months later and additional prescriptions for

31

Percocet to control the pain.[31]

Finally, with respect to the credibility determination in
this case, the Court notes that the ALJ failed to address various
applicable factors set forth in Social Security Ruling 96-7p,
which should be considered by an ALJ in assessing the credibility
of a disability claimant's statements.[32]  On remand, the ALJ is
directed to do so.

William L. Standish
United States District Judge

Date: September _30_, 2008

---

[31]In connection with the extensive treatment that Plaintiff
has received for neck and back pain, the Court finds significant
the fact that no treating physician has ever questioned the
credibility of Plaintiff's complaints of severe pain.

[32]For example, the ALJ failed to address (a) Plaintiff's
daily activities; (b) Plaintiff's willingness to undergo two
series of both lumbar and cervical epidural steroid injections in
an attempt to alleviate her neck and back pain; and (c) the fact
that the pain management specialists and the physicians at LCFM
continued to prescribe Percocet, a narcotic, to control
Plaintiff's pain, despite the medication's habit-forming
potential.

32